**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **VILLAGE OF MINOOKA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 24 C 5200** |
| | ) | |
| **WISCONSIN CENTRAL LTD.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

MATTHEW F. KENNELLY, District Judge:

The Village of Minooka has sued Wisconsin Central Ltd. (WCL), a subsidiary of

Canadian National Railway (CN). Minooka asserts a single claim seeking a declaratory

judgment that its 25-ton weight limit on McLindon Road is valid and enforceable and not

preempted by the ICC Termination Act (ICCTA) of 1995. WCL asserts a counterclaim

seeking a declaratory judgment that the ICCTA preempts Minooka's 25-ton weight limit

on McLindon Road and an injunction barring enforcement of the limit. Both sides have

moved for summary judgment. For the reasons below, the Court denies both motions.

**Background**

The following facts are undisputed unless otherwise noted. WCL plans to build

an intermodal facility and, possibly, a logistics park in what is currently farmland mostly

located in the Village of Channahon. Channahon generally borders Minooka to the east

and south, but in the area where WCL is intending to build, Channahon also lies to

Minooka's west. WCL plans to build the facility between the WCL/CN tracks and the

tracks of another railroad, CSX. A bit to the east of the planned facility, in Minooka, lies

a north-south road called McLindon Road. The CN and CSX tracks cross McLindon Road. A bit to the south of the planned facility lies US Route 6, an east-west road. A bit to the north and west of the planned facility is Interstate 80, which in this area runs (roughly) in a southwesterly-to-northeasterly direction.

WCL intends to construct the intermodal facility and logistics park in two phases. Phase one will consist of the terminal and associated administrative buildings and roadways. The second phase will consist of a logistics park with warehouses. WCL currently has no information about the types of industrial buildings that may be built at the logistics park or the types of tenants that may occupy those potential buildings.

A large volume of incoming and outgoing truck traffic is anticipated. The activities at the intermodal facility would include taking containers from railroad cars and placing them onto semitrucks, and vice versa. This short haul transportation of shipping containers by truck between a rail line and another destination is known as drayage. The drayage trucks will move the train shipments to and from the intermodal facility. The trucks are privately owned and operated. WCL anticipates that, after completion of phase one, the intermodal facility will have capacity to handle 200,000 containers annually. On a seven-day-per-week schedule, this translates to a little under 550 containers each day. After phase two is complete, the capacity could be expanded to one million containers a year—about 2,740 per day on a seven-day-per-week schedule.

WCL's initial design of the intermodal facility contemplated a single access gate on McLindon Road. After Minooka and others expressed concerns about truck traffic, WCL redesigned the facility to have two full access entrances for heavy trucks, one on McLindon Road and one to the south on Route 6. The planned gate on McLindon Road

would be at the intersection of McLindon Road and Twin Rail Drive.

Prior to March 2024, Minooka's village code provided for a 40-ton weight limit on McLindon Road from its intersection with Twin Rail Drive (which is just north of the CN-McLindon Road crossing), north to Minooka Road. To the south, toward Route 6, the weight limit was 8 tons. In March 2024, Minooka amended the village code to make the 40-ton stretch of McLindon Road start a bit further to the north—north of Twin Rail Drive—and correspondingly extended the 8-ton limit to that same spot, which is where the CSX tracks cross McLindon Road. Then in April 2024, Minooka amended the village code again, this time increasing the McLindon Road weight limit to 25 tons from Twin Rail Drive north to the CSX crossing. The limit remained at 8 tons for the stretch of McLindon Road from Twin Rail Drive all the way south to Route 6, the same limit that had existed for that stretch of McLindon Road prior to March 2024. The current weight restrictions are illustrated on the following map:



Compl. ¶ 60.

Minooka says that it enacted the weight limit ordinance to protect the health and safety of its citizens.  Sometime around 2014, Minooka says, a crack appeared in McLindon Road just north of the CSX railroad crossing.  Fixing the crack would cost approximately half a million dollars and Minooka has not budgeted for this cost.  WCL and Minooka dispute the extent of Minooka's monitoring and examination of the crack's impact on the road's condition over the past ten years.    Minooka's Village President testified that wear and tear on McLindon Road was one of his health and safety concerns related to the ordinance.  Minooka's Superintendent of Public Works testified about the concern that heavy trucks would have an impact on McLindon Road and that more heavy trucks would have more of an impact.  In addition, in December 2023, Minooka's Village Administrator informed WCL/CN that the Village opposed increased heavy vehicle access to McLindon Road because, in the Village's view, the related noise and emissions would negatively impact local air quality and the overall health of the community.[1]  The March and April 2024 ordinances stated:  "the Corporate Authorities of the Village have determined that the [weight limit] amendments effectuated by this ordinance are necessary for, and supportive of, the health, safety, and welfare of the motoring public and other residents and citizens of the City."  Def.'s Exs. JJ at 2, KK at 2.

WCL's expert witness, Jarod Hage, opines that, without access to McLindon Road, twenty-five percent of the drayage trucks estimated to enter and exit the

[1] The maps submitted by the parties reflect that there are residential neighborhoods to the east of McLindon Road, north of Route 6 and south of Interstate 80.

4

intermodal facility via McLindon Road would have to exit south on Route 6 and then "double back to head north . . . increasing roadway delays, congestion and maintenance costs." Def.'s Ex. P ¶ 90. Mr. Hage also asserts a number of opinions about the negative impact the weight limit ordinance will have on the internal operations of WCL's facility. *See generally* Def.'s Ex. P. Minooka's expert, Robert McConaughey, disagrees with Mr. Hage's opinions. *See generally* Pl.'s Exs. 12, 15.

WCL/CN sent Minooka a letter on April 26, 2024 that it said was in response to Minooka's request "that CN explain why we would not apply for local approval of our interstate intermodal terminal facility." Am. Compl., Ex. 15 at 1. WCL/CN asserted, in substance, that federal law—specifically, the ICC Termination Act, 49 U.S.C. §10501(b)—confers upon the federal Surface Transportation Board exclusive jurisdiction over rail carrier facilities like the one at issue in this case. WCL asserted that federal law "would preempt any effort to use state or local law—including any sort of permitting or approval process—to prevent the establishment" of its facility. *Id.* at 2. WCL also asserted in its letter that the ICCTA "preempts state or local laws if they are applied in a discriminatory manner." *Id.* It said that for this reason, it was "particularly alarmed by Minooka's recent amendment to its ordinance on vehicle weight limitations to decrease the truck weight on McLindon Road, which appears designed to prohibit commercial trucks from operating between CN's facility and Interstate 80." *Id.*

Minooka then filed the present lawsuit. The Village asserts a single claim seeking a declaratory judgment that its 25-ton weight limit on McLindon Road is valid and enforceable and not preempted by the ICCTA. WCL answered Minooka's claim and asserted a two-count counterclaim. In count 1, WCL seeks a declaratory judgment that

the ICCTA preempts Minooka's 25-ton weight limit on McLindon Road and an injunction barring enforcement of the limit.  In count 2, WCL sought a declaratory judgment and an injunction barring Minooka from applying to its project any "local permitting, preclearance, zoning, or similar regulations that could interfere with or prevent the construction and operation of any part of the . . . project and facility."  Ans. to Am. Compl. and Countercls., p. 48 ¶ C (prayer for relief); *id.* ¶¶ 77-78.

Minooka moved to dismiss or strike count 1 of the counterclaim on the basis that it is essentially the mirror image of Minooka's affirmative claim and thus unnecessary.  It moved to dismiss count 2 of the counterclaim on the basis that it referenced no particular regulations or enforcement actions and thus was unripe.  The Court dismissed count 2 of WCL's counterclaim as unripe but denied Minooka's motion to dismiss count 1.  *See Village of Minooka v. Wisconsin Cent. Ltd.*, No. 24 C 5200, 2024 WL 4953956, at *2 (N.D. Ill. Dec. 2, 2024*)*.

Minooka has now moved for summary judgment in its favor on its claim and WCL's counterclaim.  WCL has cross-moved for summary judgment in its favor on the same claims.

Minooka and WCL both seek a ruling regarding the 25-ton limit on McLindon Road between Twin Rail Drive and the CSX tracks.  Compl. ¶¶ 102-112; Countercl. ¶¶ 64-68; Pl.'s Mot. at 1; Pl.'s Mem. of L. at 3, 5, 26; Def.'s Mot. at 1-2; Def.'s Mem. of L. at 19, 29, 30.  Minooka's brief also states in its conclusion that it is seeking an order that "trucks that weigh over 8 tons are prohibited from traveling on McLindon Road between Route 6 and Twin Rail drive."  Pl.'s Mem. of L. at 26.  This request immediately follows the request for a declaration that Ordinance 2024-19 is a valid exercise of Minooka's

police powers under Illinois law and appears to be included within the context of that ordinance. *Id.* The remainder of Minooka's conclusion, however, refers only to the 25-ton limit. *Id.* Aside from the reference in Minooka's conclusion, Minooka and WCL do not address the 8-ton limit south of Twin Rail Drive in the briefs. This makes sense because the 8-ton limit was in place before 2024 and was not modified by either ordinance Minooka enacted in early 2024—the ordinances that led to the current dispute. The Court therefore addresses only the viability of the 25-ton weight limit between Twin Rail Drive and the CSX tracks adopted in Ordinance 2024-19.

## Discussion

Summary judgment is appropriate if there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The burden is on the moving party to demonstrate that no genuine dispute of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

In considering a motion for summary judgment, the Court views the facts in the light most favorable to the nonmoving party and draws all reasonable inferences in that party's favor. *Horton v. Pobjecky*, 883 F.3d 941, 948 (7th Cir. 2018). On cross-motions for summary judgment, the Court draws inferences "in favor of the party against whom the motion under consideration is made." *Cremation Soc'y of Ill., Inc. v. Int'l Bhd. of Teamsters Local 727*, 869 F.3d 610, 616 (7th Cir. 2017) (cleaned up). The Court may not "make credibility determinations" or "weigh the evidence." *Payne v. Pauley*,

337 F.3d 767, 770 (7th Cir. 2003).  Still, to avoid summary judgment, the nonmoving

party must identify "specific facts showing that there is a genuine issue for trial" that go

beyond a "mere scintilla of evidence."  *Johnson v. Advoc. Health & Hosps. Corp.*,

892 F.3d 887, 894, 896 (7th Cir. 2018).

## A.    Preemption

A local law must give way if it conflicts with or frustrates federal law.  U.S. Const.,

art. VI, cl. 2; *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 663 (1993); *Union Pac. R.*

*Co. v. Chi. Transit Auth.*, 647 F.3d 675, 678 (7th Cir. 2011).  But "[i]n the interest of

avoiding unintended encroachment on the authority of the States . . . , a court

interpreting a federal statute pertaining to a subject traditionally governed by state law

will be reluctant to find pre-emption.  Thus, pre-emption will not lie unless it is the clear

and manifest purpose of Congress."  *Easterwood*, 507 U.S. at 663-64 (internal quotation

marks omitted).  A court considers the text and structure of the federal statute to find

evidence of preemptive purpose.  *Id.* at 664.  "If the statute contains an express pre-

emption clause, the task of statutory construction must in the first instance focus on the

plain wording of the clause, which necessarily contains the best evidence of Congress'

pre-emptive intent."  *Id.*; *see also Dan's City Used Cars, Inc. v. Pelkey*, 569 U.S. 251,

260 (2013).

In the ICCTA, Congress "expressly conferred on the [Surface Transportation]

Board exclusive jurisdiction over the regulation of railroad transportation.*"  Chi. Transit*

*Auth.*, 647 F.3d at 678 (internal quotation marks omitted).  The operative provision of the

statute reads as follows:

The jurisdiction of the Board over—

(1) transportation by rail carriers, and the remedies provided in this part with

respect to rates, classifications, rules (including car service, interchange, and other operating rules), practices, routes, services, and facilities of such carries; and

(2) the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks, or facilities, even if the tracks are located, or intended to be located, entirely in one State, is exclusive.

49 U.S.C. § 10501(b). The statute defines "transportation" to include railroad property "related to the movement of passengers or property, or both, by rail" as well as "services related to that movement." *Id.* § 10102(9)(A)-(B). The ICCTA's remedies "with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law." 49 U.S.C. § 10501(b).

There are "two manners in which state or local actions or regulations could be preempted [by the ICCTA]: (1) categorical, or *per se*, preemption, and (2) 'as applied' preemption." *Chi. Transit Auth.*, 647 F.3d at 679. A law or regulation "may be categorically preempted on its face, or based on the specific facts of the case it may be preempted 'as applied' due to its effect on railroad transportation." *Id.* Courts have also held that local governments may apply regulations incidentally affecting railroads "as a proper exercise of police power" but those regulations must not discriminate against rail carriers or unduly burden interstate commerce. *Ass'n of Am. Railroads v. Hudson*, 144 F.4th 582, 591 (4th Cir. 2025); *CSX Transp., Inc.,* Fin. Dkt. No. 34662, 2005 WL 584026, at *3 (S.T.B. March 14, 2005). If such a regulation discriminates against rail carriers, it is impliedly preempted by the ICCTA. *Id.*

WCL argues that the weight limit ordinance is categorically preempted and that the ordinance is preempted as applied because it unreasonably interferes with rail operations and/or because it discriminates against a rail carrier. Minooka disagrees.

9

### 1.      Categorical preemption

"Categorical preemption occurs when a state or local action is preempted on its face despite its context or rationale." *Chi. Transit Auth.*, 647 F.3d at 679.  The STB has recognized "two broad categories of state and local actions to be preempted regardless of the context or rationale for the action." *CSX Transp., Inc*., Fin. Dkt. No. 34662, 2005 WL 1024490, at *3 (S.T.B. May 3, 2005).  "The first is any form of state or local permitting or preclearance that, by its nature, could be used to deny a railroad the ability to conduct some part of its operations or to proceed with activities that the Board has authorized." *Id.*  The second is any state or local regulation of "matters directly regulated by the Board" "such as the construction, operation and abandonment of rail lines", "railroad mergers, line acquisitions, and other forms of consolidation", or "railroad rates and service." *Id.*  For example, "local permitting or preclearance requirements, including building permits, zoning ordinances, and environmental and land use permitting requirements, are categorically preempted" if they apply directly to "any facilities that are an integral part of rail transportation." *Grafton & Upton R.R. Co.*, Fin. Dkt. No. 35779, 2014 WL 292443, at *4 (S.T.B. Jan. 22, 2014).

WCL argues that Minooka's weight limit ordinance "effectively regulates" rail transportation, and is thus categorically preempted, because it "restricts an essential component of 'rail transportation'—the drayage of intermodal containers to and from the intermodal rail terminal . . . ."  Def.'s Mem. of L. at 10.  This argument is unpersuasive.

WCL relies on *Norfolk Southern Railway Co. v. City of Alexandria*, 608 F.3d 150 (4th Cir. 2010), but that case provides no support for its categorical preemption argument.  Although the court in *Norfolk Southern* made several references to a "direct"

impact on the railroad's ability to move goods shipped by rail, the analysis focused on an ordinance's impact on rail transportation "as applied" to Norfolk Southern. *Id.* at 155-160. The court did not find that the ordinance, on its face, conflicted with the exclusive federal regulation of railroads. *Id.*

WCL urges the Court to adopt what would amount to an overbroad reading of categorical preemption under the ICCTA. The upshot of a determination that the weight limit ordinance is categorically preempted would be that a local government could not enact *any* regulations that could restrict traffic leaving a railroad facility, even such necessary traffic safety measures as stop lights or stop signs, and, more to the point, that there could be no weight limits at all, no matter how high. This overly broad interpretation would also mean that state or local governments could not enact any law that would impact trucks carrying goods from a railroad terminal for delivery to a customer at any point during transit. Congress "could not have intended such an expansive interpretation of the ICCTA's reach." *CFNR Operating Co. v. City of American Canyon*, 282 F.Supp.2d 1114, 1119 (N.D. Cal. 2003) (citing *Fla. E. Coast Ry. Co. v. City of West Palm Beach*, 266 F.3d 1324, 1328 (11th Cir. 2001)). Instead, categorical preemption applies only to a law that, on its face, regulates "facilities that are an integral part of rail transportation." *Grafton & Upton R.R. Co.*, 2014 WL 292443, at *4.

The weight limit ordinance does not directly regulate WCL's planned intermodal facility. WCL does not contend, and certainly has not shown, that the ordinance applies to matters directly regulated by the STB. And the ordinance does not expressly regulate traffic within the intermodal facility or otherwise outright deny WCL the ability to conduct

railroad operations.  Instead, the ordinance restricts certain traffic—trucks over 25 tons—from traveling on a public roadway that lies to the east of the facility.  The trucks that WCL argues will be impacted by the ordinance are privately owned and operated. At most, the restriction may, depending on the extent of the impact, unreasonably interfere with WCL's operations of the intermodal facility.  The Court concludes that the ordinance is not categorically preempted under the ICCTA.

### 2.    Unreasonable interference

"If an action is not categorically preempted, it may be preempted 'as applied' based on the degree of interference that the particular action has on railroad transportation—this occurs when the facts show that the action 'would have the effect of preventing or unreasonably interfering with railroad transportation.'" *Chi. Transit Auth.*, 647 F.3d at 679 (quoting *CSX Transp., Inc.*, 2005 WL 1024490 at *3); *see also Wedemeyer v. CSX Transp., Inc.*, 850 F.3d 889, 895 (7th Cir. 2017).  Preemption under this standard applies when the interference is "significant." *Chi. Transit Auth.*, 647 F.3d at 683.  The "as applied" framework generally requires "a fact intensive inquiry." *Belt Ry. Co. of Chi. v. Weglarz Hotel III, L.L.C.*, No. 18 C 7361, 2020 WL 6894664, at *9 (N.D. Ill. Nov. 24, 2020) (collecting cases).

Minooka argues that the weight limit ordinance does not unreasonably interfere with rail transportation because WCL would only need to redirect twenty-five percent of its contemplated heavy vehicle traffic to the Route 6 entrance.  WCL responds that the weight limit will unreasonably interfere with its operations because it will impact the internal traffic at the facility as well as the ability to effectively load and unload trains.

Although WCL relied on *Norfolk Southern* in support of its argument that the

ordinance was categorically preempted, it is more applicable to the "as applied" inquiry. The Court will therefore address the case in more detail here. Norfolk Southern operated an ethanol transloading facility in Alexandria, Virginia. *Norfolk Southern*, 608 F.3d at 154. At the facility, Norfolk Southern transferred bulk shipments of ethanol from its railcars onto surface tank trucks that were operated by third parties. *Id.* The trucks loaded at the facility then transported the ethanol via the streets of Alexandria to nearby interstate highways. *Id.* Alexandria issued a thirty-day haul permit to Norfolk Southern that imposed several conditions, including limiting what could be hauled and the number of trucks that could operate each day, specifying a hauling route, and restricting the days and times for such hauling. *Id.* at n.3. Norfolk Southern declined to abide by the permit. *Id.* at 155. Alexandria then amended its ordinance so that it expressly governed the transportation of "bulk materials," including ethanol. *Id.*

The court found that Alexandria's ordinance and permit restricting Norfolk Southern's actions were preempted by the ICCTA. *Id.* at 158. The court noted that the ordinance authorized Alexandria to impose any "conditions and restrictions, as the director [or transportation] may deem appropriate to promote traffic safety." *Id.* The court concluded that this open-ended provision granted Alexandria "unlimited control over the Facility and its transloading" and thus "regulate[d] ethanol transloading at the Facility." *Id.* The court also relied on testimony from Norfolk Southern officials that "the backlog in rail traffic caused by the restrictions specified in the Permit would adversely affect the continuous movement of freight through our yards" and the "effect could ripple elsewhere through the [Norfolk Southern] rail system." *Id.* at 159.

Although the facts in *Norfolk Southern* are somewhat similar to this case, there

13

are significant differences. First, the ordinance and permit in *Norfolk Southern* gave the city "unlimited control" over the railroad facility itself. Minooka's weight limit ordinance, by contrast, sets a definite weight limit for a public road that borders part of the facility but is entirely located outside the facility's bounds. And the ordinance does not give Minooka unlimited discretion to enact any other restrictions it deems necessary. The weight limit ordinance therefore does not give Minooka "unlimited control" over the activity in and out of the facility.

WCL contends that the "second aspect" of the unreasonable burden analysis "is the effects of allowing similar regulations in jurisdictions across the rail network." Def.'s Mem. of L. at 14 (citing *Thomas Tubbs*, Fin. Dkt. No. 35792, 2014 WL 5508153, at *5 (S.T.B. Oct. 31, 2014)). The cases WCL cites do not support this proposition, and the Court has found no support for it. It is true that the STB has stated that the purpose of ICCTA "preemption is to prevent a patchwork of state and local regulation from unreasonably interfering with interstate commerce." *Thomas Tubbs*, 2014 WL 5508153, at *5. But this applies when a regulation would "interfer[e] with the railroad's ability to uniformly design, construct, maintain and repair its railroad line." *Id.* In particular, "[t]he interstate rail network could not function properly if states and localities could impose their own potentially differing standards for these important activities, which are an integral part of, and directly affect, rail transportation." *Id.*

As discussed, the weight ordinance does not directly affect rail transportation. And even if the ordinance did directly affect rail transportation, any consideration of actions that Minooka may wish it could take or actions that another municipality could take in the future (without even an indication that such action may be taken) would be

speculative at best. *But see CSX Transp., Inc. v. Williams*, 406 F.3d 667, 673 (D.C. Cir. 2005) (per curium) (noting consideration of other jurisdictions' laws was "not a speculative exercise" because other states were actively considering similar laws that may, in the aggregate, "wreak havoc with the national system of hazardous materials shipment").

Furthermore, the parties' experts disagree on the ordinance's impact on WCL's rail operations. For example, WCL's expert, Mr. Hage, opines that "strategically placed and efficient truck access gates [such as the gate WCL has planned for McLindon Road] are critical to intermodal terminal operations." Def.'s Ex. P at 8. Mr. Hage asserts that strategically placed gates aid in providing a safe working environment for train crews, terminal employees and the drayage drivers. *Id*. Minooka's expert, Mr. McConaughey, responds that the weight restriction on McLindon road will not "adversely affect the safety of the working environment of the intermodal terminal." Pl.'s Ex. 15, at 3. Mr. Hage also asserts that "[d]elays in drayage can adversely affect train schedules and customer commitments, either by delaying a train or by causing a shipment to miss the planned train. This leads to a cascading effect that can result in considerable operational inefficiencies beyond just a single intermodal terminal . . . ." *Id.* at 4. Mr. McConaughey replies that "the cause of a train delay would likely be the result of insufficient volumes before the cutoff time, not because of any weight restriction on McLindon Road." *Id.* As a final example, Mr. Hage notes that "gate delays can cause a shipment to miss the train departure cut-off time " and "may cause a container to miss an unload shift at the receiver's dock . . . ." *Id.* Mr. McConaughey counters that "[t]he proposed gate layout, with one gate at McLindon restricted to 25 tons for inbound and

outbound and one at Route 6 with proper lanes for both ingate and outgate, is efficient and would not be a material cause of delayed drayage." *Id.* These are several examples of the disputes between Mr. Hage and Mr. McConaughey; the Court has not endeavored to provide an exhaustive list.

Based on these disputes and others like them, a reasonable jury could conclude that the weight limit ordinance unreasonably interferes with rail transportation because it has a significant impact on the operation of WCL's facility. On the other hand, a reasonable jury could conclude that the weight restriction does not have a significant impact on the operation of the facility and therefore does not unreasonably interfere with rail transportation. This genuine dispute precludes summary judgment in favor of either party.

### 3.   Discrimination

Although the Seventh Circuit has not addressed the question, other courts have held that health and safety regulations are not preempted by the ICCTA, even if they incidentally affect rail transportation, so long as the regulation does not discriminate against rail carriers or unduly burden interstate commerce. *CSX Transp., Inc.,* 2005 WL 584026, at *3; *Norfolk Southern*, 608 F.3d at 158. Because the Court has already addressed the issue of undue burden, it will not repeat that discussion here.

The ICCTA's preemption clause "blocks actions by states or localities that would impinge on the Board's jurisdiction or a railroad's ability to conduct its rail operations." *Id.* "Congress's intent in the Act to preempt state and local regulation of railroad transportation has been recognized as broad and sweeping." *Union Pac. R. Co. v. Chi. Transit Auth.*, 647 F.3d 675, 678 (7th Cir. 2011). But the scope of section 10501(b) is

16

not without limits.  *CSX Transp., Inc.,* 2005 WL 584026, at *3; *see also Delaware v. Surface Transp. Bd.*, 859 F.3d 16, 18 (D.C. Cir. 2017) (explaining that ICCTA preemption "does not encompass everything touching on railroads").  "Preemption does not deprive the states of the 'power to regulate where the activity regulated [is] a merely peripheral concern' of Federal law."  *Cities of Auburn & Kent, Washington*, 2 S.T.B. 330, *5 (1997) (quoting *San Diego Building Trades Council v. Garmon*, 359 U.S. 236, 243 (1959)).  "In short, where the state or local law can be applied without interfering with the Federal law, the courts have done so."  *Id.*

In particular, the "ICCTA does not usurp the right of state and local entities to impose appropriate public health and safety regulation" on railroads.  *King County, Washington*, Fin. Dkt. No. 32974, 1996 WL 545598, at *3 (S.T.B. Sept. 25, 1996). "Thus, courts have found it permissible for a state . . . to apply state and local requirements such as building and electrical codes [to railroad facilities] as long as they do so without discrimination."  *CSX Transp., Inc.,* 2005 WL 584026, at *8.

A generally applicable regulation may be discriminatory, and thus preempted by the ICCTA, if it is "used as a pretext to carry out a policy of delay or interference" with rail service.  *New York Susquehanna & W. Ry. Corp. v. Jackson*, 500 F.3d 238, 247 (3d Cir. 2007).  Such regulations "must be clear enough that the rail carrier can follow them and . . . the state cannot easily use them as a pretext for interfering with or curtailing rail service."  *Id.*  Typically, the regulation at issue directly impacts the rail carrier's facility. *See, e.g., Mountain R.R. Corp. v. Vermont*, 404 F.3d 638, 643 (2d Cir. 2005) (noting that "direct environmental regulations enacted for the protection of the public health and safety, and other generally applicable, nondiscriminatory regulations and permit

17

requirements would seem to withstand preemption"); *Vermont Ry., Inc. v. Town of Shelburne*, 287 F. Supp. 3d 493, 500 (D. Vt. 2017) (finding preemption based on discrimination where the law in question would "place significant restrictions on when and where rail cars move" and whether a railroad could store certain commodities on its property); *Flynn v. Burlington N. Santa Fe Corp.*, 98 F. Supp. 2d 1186, 1189 (E.D. Wash. 2000) (noting that a local government may exercise some control over a railroad facility as long the law is applied in a non-discriminatory manner). This case, however, does not involve direct regulation of a railroad facility. Instead, there is an initial dispute over whether the weight limit ordinance impacts WCL's operations at all.

It would make no sense to find ICCTA preemption based on Minooka's motivation alone. If a factfinder determined that the ordinance was enacted for health and safety and did not—in practice—interfere with WCL's rail operations, it would be illogical to find that the law was preempted simply because the Village discriminated against the railroad when enacting the law.

The Court therefore concludes that whether the ICCTA preempts state or local law based on discrimination against a rail carrier is a question of both motivation and impact. WCL must show that, in enacting the weight limit ordinance, Minooka intended to interfere with or delay rail service at the intermodal facility and the ordinance did in fact interfere with or delay rail service.

Contrary to WCL's contention, analyzing Minooka's motivation does not require a subjective analysis of the intent of individual public officials. *See United States v. O'Brien*, 391 U.S. 367, 383 (1968) ("What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it, and the

stakes are sufficiently high for us to eschew guesswork.").  The Supreme Court's decision in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977), is instructive here.  In *Arlington Heights,* the Court addressed the types of evidence that may be relevant to prove that a "discriminatory purpose" was a "motivating factor" in the legislature's decision to enact a law in the context of an Equal Protection Clause claim.  *Arlington Heights*, 429 U.S. at 265.

The Court explained that, when evaluating a legislative body's motivation, relevant evidence includes:  1) the "historical background of the decision"; 2) the "specific sequence of events leading to [passage]"; 3) "procedural" and "[s]ubstantive departures" from the typical legislating process; and 4) "legislative or administrative history" including "contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports."  *Arlington Heights*, 429 U.S. at 267–68; *see also United States v. Viveros-Chavez*, 114 F.4th 618, 626 (7th Cir. 2024).  The Court also stated that only in "extraordinary circumstances" will individual members of the decisionmaking body "be called to the stand at trial to testify concerning the purpose of the official action."  *Arlington Heights*, 429 U.S. at 267.  And "even then such testimony frequently will be barred by privilege."  *Id.*  The Seventh Circuit has also cautioned that "the statements of one or two legislators without more may not be probative of the intent of the entire body."  *Viveros-Chavez*, 114 F.4th 618 at 624.  The Court concludes that the same types of evidence are relevant to show whether Minooka acted with a discriminatory motive when enacting the weight limit ordinance.

WCL argues that Minooka's true motives for enacting the weight limit ordinance were to discriminate against the WCL intermodal facility, not to protect health and safety

of the community.[2]  Minooka contends that it enacted the ordinance to protect the health and safety of its citizens, including concerns about the condition of McLindon Road and the potential impact of a significant increase in heavy truck traffic on the road's condition.

There are genuine factual disputes on the question of Minooka's motivation when enacting the weight limit ordinance and on whether the ordinance will impact the internal operations of the intermodal facility.  Minooka's Village President testified that wear and tear on McLindon Road was one of his health and safety concerns related to the ordinance.  And Minooka's Superintendent of Public Works testified about the concern that heavy trucks would have an impact on the condition of McLindon Road and that more heavy trucks would have more of an impact.  Minooka also expressed general concerns about the health and safety of the Village's residents based on additional heavy truck traffic on McLindon Road.  WCL, by contrast, contends that Minooka's expressed health and safety concerns are a pretext for Minooka's real goal:  to interfere with the operation of its proposed intermodal facility.  In support of this contention, WCL cites Minooka's increase in the weight limit for the relevant portion of McLindon Road from 8 to 25 tons after other businesses complained.  WCL also cites comments from Minooka's Village President and trustees that "reflect[] Village officials' negative view of railroad projects and especially intermodal terminals."  Def.'s Mem. of L. at 21-22.  And,

---

[2] WCL further argues that weight limit ordinance applies on its face only to railroads but also is facially neutral.  Def.'s Reply at 11.  To state the obvious, a regulation cannot both apply only to railroads on its face and be facially neutral.  It appears that WCL's actual argument is that the ordinance is facially neutral—"it technically applies to all traffic above 25 tons"—but that it is discriminatory as applied because "it is gerrymandered to target only [WCL] traffic, sparing other nearby businesses."  *Id*.

as discussed, there is a dispute of fact regarding whether the ordinance would—in practice—have an impact (unreasonable or otherwise) on WCL's rail service.

These points are genuinely disputed; a reasonable factfinder could come out either way. Thus neither side is entitled to summary judgment.[3]

## B.    Logistics park

Minooka argues that WCL's counterclaim "lumps both the Intermodal Facility and Logistics Park components together and requests that this Court find that they both 'fall[] within the ICCTA's preemptive scope.'" Pl.'s Mem. of L. at 20 (citing Countercl. ¶¶ 19, 63). Minooka thus seeks partial summary judgment in its favor in the form of a ruling that the ICCTA cannot preempt the weight limit ordinance as applied to the logistics park.

WCL responds that its counterclaim with respect to the logistics park was dismissed as unripe. *See Village of Minooka*, 2024 WL 4953956, at *2. In count 2 of its counterclaim, WCL sought a declaration that "Minooka cannot apply to the [Chicago Logistics Hub] project [including the intermodal facility and logistics park] any permitting, preclearance, zoning or similar regulations that could prevent or impede the project's construction or operation." Countercl. ¶ 77. But, in substance, WCL's allegations in count 2 sought a declaration that "the proposed logistics park and warehousing for non-

---

[3] In a footnote, WCL asks the Court to reopen discovery on legislative motivation. The Court overrules the request. At the hearing on WCL's motion to compel, the Court explained that the discriminatory motive of one individual cannot typically be used as evidence to show the entire legislation was enacted based on discrimination because "those types of analyses" are "almost impossible to do." 1/29/2025 Tr. at 31:4-8; *see also O'Brien*, 391 U.S. at 384. As the Court noted, WCL has access to the documentary evidence about the history of the Ordinance, including the legislative history. *Id.* at 30:6-11. The Court's decision today does not alter its previous analysis.

rail uses that are within Minooka's jurisdictional boundaries" will not be subject to Minooka's permitting process. *Id.* at ¶ 75. The Court found that the claim was unripe because "[t]he problem is either that there is no regulation or permitting requirement aside from the McLindon Road weight limit that has actually been interposed that would halt or interfere with WCL's construction or operation of the project or that there is something of that sort, but WCL has not identified what it is." *Village of Minooka*, 2024 WL 4953956, at *2. But although count 2 was dismissed, count 1 of WCL's counterclaim also refers to "the CLH" and "the CLH project." Countercl. ¶¶ 63, 66, 67. WCL consistently defines the CLH and CLH project to include both the intermodal facility and the logistics park. Countercl. ¶ 19, Def.'s Mem. of L. at 10. Thus it appears that count 1 of WCL's counterclaim also includes the logistics park.

WCL further argues that there is no ripe dispute about the logistics park because the tenants and uses for the warehouses for that portion of the project are not yet known. It is undisputed that there is currently not "any information as to who is owning or leasing the warehouses or industrial buildings . . . or what activities are being conducted at the warehouse[s]." Def.'s Reply at 15. And there is no dispute that WCL has no final plans for the logistics park.

To the extent count 1 of WCL's counterclaim seeks a declaratory judgment that the weight limit ordinance, as applied to the logistics park, is preempted by the ICCTA, the claim is unripe. As discussed, the question of preemption involves a fact-intensive inquiry to determine the extent of the law in question's impact on rail operations at a particular facility or whether the law discriminates against the relevant railroad facility. Under 28 U.S.C. §2201(a), issuance of a declaratory judgment requires an "actual

controversy," and there is currently no available information about the logistics park, or how the 25-ton limit might impact it, that would satisfy this requirement. *See generally J.N.S. Inc. v. State of Indiana*, 712 F.3d 303, 305 (7th Cir. 1983) ("It is insufficient that an actual controversy may occur in the future; it must presently exist in fact."); *see also, e.g., Wis. Central, Ltd. v. Shannon*, 539 F.3d 751, 759 (7th Cir. 2008).

## Conclusion

For the reasons stated above, the Court denies Minooka's motion for summary judgment [dkt. no. 97] and denies WCL's cross-motion for summary judgment [dkt. no. 100]. The Court sets the case for a telephonic status hearing on January 15, 2026 at 9:00 a.m., using call-in number 650-479-3207, access code 2305-915-8729, to discuss the length of trial and set a prompt trial date.

Date: January 12, 2026

_____
MATTHEW F. KENNELLY
United States District Judge